**UNITED STATES of America,
Appellee,**

v.

**Armand BILOTTI, Stephen Harris, Michael La Marca and Harry Wasser,
Appellants.**

**No. 391, Docket 30751.**

United States Court of Appeals
Second Circuit.

Argued April 4, 1967.

Decided July 13, 1967.

Certiorari Denied Nov. 6, 1967.

See 88 S.Ct. 308.

Charles P. Sifton, Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., and Daniel R. Murdock, and Michael W. Mitchell, Asst. U. S. Attys., Southern District of New York, on the brief), for appellee.

H. Elliot Wales, New York City, for appellant Bilotti.

Albert H. Buschmann, Jamaica, N. Y., for appellant Wasser.

Bernard J. Coven, New York City, for appellants Harris and La Marca.

Before WATERMAN, FRIENDLY and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On March 4, 1965, a 48 count indictment was filed against fourteen defendants including the four appellants here. The first count charged an overall conspiracy to violate the registration and anti-fraud provisions of the Securities Act. Counts 2–21 dealt with violations of registration provisions and did not involve the four appellants here. Counts 22–48 charged appellants and other broker-dealers with violations of the anti-fraud provisions of § 17(a).[1] Seven of the fourteen defendants indicted were put to trial in the instant case—the four appellants, Hayutin, Nash and Stanley Scheftel, another broker-dealer who sold to the public. The Count 1 conspiracy was dismissed by the court as to appellant Bilotti; and the jury was unable to reach a verdict on the conspiracy count as to any of the other three appellants.[2] However, under Counts 22–48, the jury found each of the appellants guilty of three instances of violating § 17(a).

The evidence introduced by the Government may be found to have established the following facts. In September, 1962, the Allied Entertainment Corporation of America, Inc., a small popular music publishing business formed by two dentists, Dr. Herbert Breger and Dr. David Blistein, had an accumulated earnings deficit and was badly in need of working capital. Dr. Breger turned for aid to Marvin Hayutin, who had recently helped Breger salvage an initially unsuccessful public offering of Allied shares through an arrangement whereby over-the-counter brokers Anthony Gravino and Leon Nash sold Allied shares to the public in return for secret commissions from Breger while trader Fred Gearhart and others maintained and raised the market price of Allied by various manipulative practices. Hayutin now proposed to market a large amount of Allied shares without registration with the Securities & Exchange Commission[3] by having Allied acquire two other corporations, Tap Records, Inc. and American Stereophonic Corporation. Tap Records at that time was wholly owned by Miklos Gafni. It was arranged for Harold Schreiber to acquire a 50% interest in Tap Records prior to the merger with Allied because it was thought that Schreiber could later market Allied shares without need

---

1. 15 U.S.C. § 77q(a) reads as follows:
"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

2. The jury reached a verdict on the conspiracy count only as to defendant Nash, who was found guilty.

3. The earlier public offering had involved less than $300,000 and had qualified for an exemption from full registration under the Commission's "Regulation A" under the 1933 Securities Act, in particular § 3 (b) thereof [15 U.S.C. § 77c(b)].

to register them.[4] Gafni also owned 25,000 of American Stereo's 105,000 outstanding shares. Prior to the merger a pool was formed by Gravino, Nash, Breger, Blistein, Hayutin and others to acquire shares of American Stereo; by the time of the merger, the pool had about 19,000 shares. In mid-December 1962, Allied acquired Tap Records by issuing 62,500 shares, of which 31,250 went to Schreiber and 31,250 to Gafni, and it acquired American Stereo by issuing 69,534 shares, of which 16,824 went to Gafni and some 13,000 to the pool. Gafni gave 14,660 of the Allied shares he received for American Stereo to two relatives, Salvatore and Marie Mazzareze. The desire to sell to the public the Allied shares held by Schreiber, the pool, and the Mazzarezes led to a search for additional "retailers"; it was this effort which brought the four appellant broker-dealers into the picture.

The appellants Wasser and Harris were principals of the brokerage firm of B. G. Harris & Co., Inc.[5] Appellant Bilotti was a partner in the firm of Linder, Bilotti & Co. Appellant La Marca was president of the firm of J. P. Howell & Co., Inc. In December 1962–January 1963, each of the appellants[6] was contacted by one or more insiders in the marketing of Allied shares, principally by Breger and Gravino. In each case it was agreed that the firm contacted would sell Allied shares to the public in return for secret commissions to be paid by the Allied insiders.[7] In addition it was arranged for B. G. Harris and J. P.

Howell to publish under their respective letterheads a market letter recommending Allied stock, and this was in spite of the fact that a previous Allied offering circular had showed a deficit of $80,000 as of May 31, 1962. Also certain traders helped keep up the market price of Allied by entering artificial bid and asked quotations. During the first six months of 1963, B. G. Harris sold 1,350 shares of Allied to the public; Linder, Bilotti, 11,850; and J. P. Howell, 2,450. The appellants obtained the Allied shares which they sold from various member firms where the shares had been placed by the Allied insiders. In each case the testimony was that appellants' firms had sold shares of Allied to a member of the public with fraudulent misrepresentations about the value of the stock and without disclosure of the commissions being received for the sales from Allied insiders. It is from the judgments entered on these verdicts that the present appeals are taken.

■■ Appellant Wasser attacks the sufficiency of the evidence that he was a principal of the B. G. Harris firm, but there is no merit to this claim. Dr. Breger testified to Wasser's key role in the meeting in which it was arranged for B. G. Harris & Co., Inc. to sell Allied stock in return for commissions and to publish an Allied market letter under the firm's letterhead; Breger testified to a later meeting with Wasser during which Wasser asked for a list of American Stereo shareholders as prospects for additional Allied sales. Breger testified

4. Schreiber had recently suffered financial difficulties, and it was thought that, by back-dating Schreiber's acquisition of Tap, he could sell the large block of shares received without being deemed a statutory "underwriter."

5. Appellant Wasser attacks the sufficiency of the evidence that he was so connected with B. G. Harris & Co., Inc. See discussion below.

6. Actual face to face negotiations for Linder, Bilotti & Co; were conducted by Hyman Linder. However, the Government's evidence showed that Bilotti was kept fully informed of all arrangements,

participated in carrying them out, and split secret commissions 50-50 with Linder. Bilotti does not question the sufficiency of the evidence on this appeal.

7. The terms of the additional commissions varied with the various appellants and blocks of stock. With Linder, Bilotti & Co. the commissions were in the form of guarantying a fixed percentage profit on the sales. In most other cases the commissions were a straight fifty cents per share. The stock was selling in the general range of $3–$4 per share, so that the commissions involved here were in the vicinity of 15% of the sale price.

further that Stephen Harris, president of the Harris firm told him that he (Harris) would have to act as intermediary between Wasser and the Allied people. On cross-examination Dr. Breger testified that Wasser told him that B. G. Harris & Co., Inc., was really his (Wasser's) firm but that, because of certain problems, he could not be officially associated with the firm; he also testified on cross-examination that Harris told him that Wasser was "running the show" but that because of "some problems with the State Attorney General's office" Wasser could not be around the B. G. Harris office. Gravino testified that he met with Harris and Wasser on two occasions and each time paid them $250 for selling 500 shares of Allied. Wasser did not take the stand. Harris testified in substance that he knew Wasser personally but that Wasser had nothing to do with the B. G. Harris firm; Harris denied ever receiving any payment from Gravino. The jury was thus presented with a clear cut issue of credibility, and they chose to believe Breger and Gravino. United States v. Kelly, 349 F.2d 720, 766 (2 Cir. 1965). Wasser complains further that it was inconsistent for the jury to have convicted him on the substantive counts but not on the conspiracy count. Even if this were true, it would not be grounds for reversal. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. Andreadis, 366 F.2d 423, 434–435 (2 Cir. 1966), cert. denied, 385 U.S. 1001 (1967).

■■ The appellant Bilotti contends that the court erred in admitting documentary evidence of nine sales of Allied shares by Linder, Bilotti & Co. to Mrs. Eily Della Chiesa in addition to the one sale to Mrs. Della Chiesa which was charged in the indictment.[8] The sale in the indictment was for 1200 shares; the other nine totalled about 1450 shares. Evidence of other similar illegal activities offered for a relevant purpose, other than merely to show a defendant's bad character, is admissible. United States v. Jones and Mittelman, 374 F.2d 414, 419 (2 Cir. 1967). Of course, the trial court may in the exercise of its sound discretion exclude such evidence if its probative value is outweighed by its prejudicial character. United States v. Knohl, 379 F.2d 427, 438 (2 Cir. 1967); United States v. Braverman, 376 F.2d 249, 252–253 (2 Cir. 1967); United States v. Byrd, 352 F.2d 570 (2 Cir. 1965). In the present case the evidence of the nine additional transactions was of value in showing the scope of the scheme as it related to the transaction charged and to show the criminal purpose and intent. Farmer v. United States, 223 F. 903 (2 Cir.) cert. denied 238 U.S. 638, 35 S.Ct. 940, 59 L.Ed. 1500 (1915); United States v. Walker, 176 F.2d 564, 566 (2 Cir. 1949); United States v. Shurtleff, 43 F.2d 944, 947 (2 Cir. 1930). Moreover, Mrs. Della Chiesa's testimony put no emphasis on the total number of sales or shares; rather she simply described Bilotti's seeking her out and the representations he made in inducing her initially to purchase Allied stock.[9] The trial judge did not abuse his discretion in admitting the evidence of other sales.

■ Appellants La Marca and Harris object to the cross-examination by the Government of a character witness for the defendant Hayutin. The Government put to this witness a series of questions as to whether or not he had ever heard of various unsavory activities and associations of Hayutin. The questions and answers made no reference to La Marca or Harris. Our scope of review in this area is very narrow:

"Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations difficult to detect or ap-

---

8. The evidence objected to was admitted against Bilotti only with respect to the one substantive count for fraud in the sale of Allied shares to Mrs. Della Chiesa.

9. Mrs. Della Chiesa also testified as to Bilotti's endeavors to get her to support him in the subseqent S. E. C. investigation.

praise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject."

Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 93 L.Ed. 168 (1948).[10] The trial judge sustained objections to some of these questions by the Government because they were too prejudicial to Hayutin. He satisfied himself of the factual basis for the remaining questions either through his own personal knowledge from other trials or through information submitted by the Government out of the presence of the jury. At the time he admitted the questions and answers, the judge instructed the jury as to the limited purposes for which they were being received. He repeated this instruction in the charge. There was no abuse of discretion. See United States v. Giddins, 273 F.2d 843, 846 (2 Cir. 1960.)

 Four errors are alleged with respect to the trial court's charge; two, raised by appellants La Marca and Harris only, are insubstantial. The court's charge on reasonable doubt was framed in terms of "an abiding conviction * * * which amounts to a moral certainty," such as the jurors "would be willing to act upon in important and weighty matters in the personal affairs of * * * life," and also in terms of a doubt which might cause the jurors "confronted with an important decision * * * [to be] beset by doubt and uncertainty and unsure of * * * [their] judgment." It is argued that these two characterizations of reasonable doubt are inconsistent and must have confused the jury; but this is so only if the words are taken out of context. While the preferred definition of reasonable doubt is a doubt which would cause one to "hesitate" to act, Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed.

150 (1954), and the trial judge would best adhere to that wording, the use of generally equivalent language and of its less acceptable counterpart, "willing to act", is not in the context of this whole charge reversible error, especially where no objection to the charge was made below. Fed.R.Crim.P., Rule 30. After two days of deliberation by the jury, the court gave a standard "Allen"[11] charge. While a number of objections to it are now made, the only one which calls for brief comment is that the court failed to say specifically that no juror should yield a conscientious conviction. However, the court did charge:

"[T]he verdict must be the verdict of each individual juror, and not mere acquiescence or agreement, without more, in the conclusions of others. * * * [I]t is to be a verdict unanimous, without mute acquiescence to the views, with no reflection whatsoever. * * * I have not the right under the law to coerce you or suggest to you that you have got to reach a verdict in such a way and so on. Not only do I not have that right under the law, but even if I did, I would not want to do so. * * * "

This language made it sufficiently clear that a juror ought not abandon his personal conviction.

 The appellants also object to that portion of the charge in which the court said,

"*In our law there is a presumption that* unless and until determined by you to be outweighed by the evidence to the contrary, *a witness speaks the truth.*" [Emphasis added.]

This point is particularly pressed by appellants Bilotti and Wasser, who did no testify themselves nor introduce any witnesses on their own behalf. A presumption that witnesses tell the truth, appellants contend, conflicts with a defend-

---

10. In *Michelson* the prosecutor was allowed to ask a character witness whether he had heard that the defendant had been arrested (not convicted) twenty-seven years earlier for an offense not closely similar to the one for which he was on trial.

11. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

ant's right to remain silent and with the principle that the burden of proof is on the prosecution.

The problem is not quite as clear cut as the appellants describe it because the court said much more:

> "In our law there is a presumption that unless and until determined by you to be outweighed by the evidence to the contrary, a witness speaks the truth. You have seen and heard the witnesses give their testimony, both on direct examination and cross-examination. You have the right and obligation to weigh their evidence upon such bases as behavior on the witness stand, their conduct, their relationship to the parties here, thtir possible bias or impartiality, the reasonableness of their statements under the surrounding circumstances, the strength or weakness of their recollections, their testimony in relation to other evidence in the case, how they may be affected by your verdict, any possible motivation to testify falsely, and the like.
>
> In short, ladies and gentlemen, you can 'size up' a witness and decide whether he testified in a reasonable, candid and forthright manner. You have the right to accept or reject wholly or in part the testimony of any particular witness. You are the sole judges of the credibility of the witnesses."

This charge is closely patterned after Mathes, Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 67–68 (1961) No. 3.01.[12] The structure of the court's charge and the recommended charge is the same: an initial statement of a presumption of credibility followed by an explanation of how the presumption can be overcome, including consideration of factors other than directly contradictory evidence.

■ There is no judicial authority for the "presumption of credibility" charge in a federal criminal trial. It has been considered in three recent decisions. United States v. Persico, 349 F.2d 6, 10–12 (2 Cir. 1965); United States v. Meisch, 370 F.2d 768, 773–774 (3 Cir. 1966) (dicta); United States v. Johnson, 371 F.2d 800, 804–805 (3 Cir. 1967).[13] In each case the "presumption of credibility" charge was disapproved; and in Persico and Johnson reversals were based on the point. Although it is not entirely clear, it appears that in Johnson, the explanation did not accompany the statement of the presumption. In Persico the explanation was definitely not charged, and this court in an opinion by a district judge, sitting by designation, concurred in by one circuit judge, the other circuit judge concurring in the result, implied that if the explanation had been included, the charge would not have been grounds for reversal. Prior to these three decisions Judge Mathes himself had abandoned the charge which he had authored. In his 1965 edition, Judge Mathes omits all references to "presumption" and "outweighing." The

---

12. "A witness is presumed to speak the truth. But this presumption may be outweighed by the manner in which the witness testifies, by the character of the testimony given, or by contradictory evidence. You should carefully scrutinize the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness's intelligence, motive and state of mind, and demeanor and manner while on the stand. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence.
\* \* \* If you find the presumption of truthfulness to be outweighed as to any witness, you will give the testimony of that witness such credibility, if any, as you may think it deserves."

13. The presumption charge was also considered briefly in a *per curiam* opinion in Knapp v. United States, 316 F.2d 794 (5 Cir. 1963), where the court was divided over whether the charge was error but were unanimous that it was not "plain error."

**656**

core of his new recommended instruction on credibility reads:

> "Ordinarily, it is *assumed* that a witness will speak the truth. But this *assumption* may be *dispelled* by the appearance and conduct of the witness, or by the manner in which the witness testifies, or by the character of the testimony given, or by evidence to the contrary of the testimony given." [Emphasis added.]

Mathes and Devitt, Federal Jury Practice and Instructions (1965), No. 72.01.

█ The dangers created by a charge that witnesses are *presumed* to tell the truth are obvious—especially where the defendant does not take the stand or put on an affirmative case himself. The presumption of defendant's innocence could be rendered nugatory if the jury believed, as they might, that they were to take all uncontradicted testimony as true. Here there was an ample safeguard against such a happening because the explanation following the presumption made it clear that the jury for a variety of reasons could disbelieve an uncontradicted witness. We therefore conclude, in line with the dicta in *Persico*, that a charge of the presumption with a full explanation of how it can be overcome is not reversible error. But if the charge of presumption of credibility stands by itself without appropriate explanation it is reversible error, as was held in *Pirsico*. Even if such explanation is included, however, we conclude that the "presumption of credibility" instruction serves no useful purpose. It may in some cases be very misleading and the trial courts would best refrain from using it. If a case should present unusual circumstances which cause the trial judge to feel that some instruction to the jury is called for on its initial approach to a witness's credibility, Mathes and Devitt's new recommendation, supra, presents less opportunity for the jury to be misled.

█ The appellants Bilotti and Wasser contend that the court below instructed the jury that their failure to disclose commissions received from Allied insiders was a violation of § 17(a) (2). It appears that the appellants have misread the court's charge. The court did not say that nondisclosure of commissions was a violation of § 17(a) (2), but rather that such nondisclosure might be *one element* of an overall violation of § *17(a (1)*.[14] Its instruction carefully considered the language in the statute.

The charge reads:

> "[I]t would not be enough for you to merely find that these payments were made in order to convict any one of the defendants here charged. You would have to be satisfied that *part of the scheme to defraud was to receive these cash payments and to conceal them* from the outside world and most particularly from any potential members of the public who would be approached, or were approached, to buy Allied Entertainment stock. In other words, it would be perfectly legal and valid, ladies and gentlemen, if a broker were to take these payments * * * above the normal commission so long as that broker-dealer made disclosure of that fact to his customers or potential customers. Thus, I reiterate, you would be obliged to find on the facts here not only that the payments were made as alleged but also *that it was part of the scheme to defraud that a broker-dealer in question * * * would conceal the fact that these payments had been made* * * *." [Emphasis added.]

It is clear that the court did not charge that nondisclosure alone could be either a "scheme to defraud" [§ 17(a) (1)] or an "omission to state a material fact" [§ 17(a) (2)], but rather that it could be part of a scheme to defraud the public by selling them worthless stock.[15] Ample

---

14. The indictment charged violations of all three subsections of § 17(a).

15. Appellants impliedly argue in their briefs that nondisclosure can be an ele-

ment only of a § 17(a) (2) violation and not of a § 17(a) (1) or § 17(a) (3) violation. There is neither reason nor authority in support of such a proposition.

evidence was introduced that all of appellants' firms made flagrant oral misrepresentations about the value of Allied stock, and that all but one firm put these misrepresentations in print in their market letters. It was proper for the trial court to have charged that in the context of these misrepresentations, the jury might consider the nondisclosure of commissions as part of a scheme to defraud.[16] We are, therefore, not presented with a case where the only possible wrong by a securities dealer [17] was nondisclosure of commissions; and this decision does not cover such a case.

The judgments of conviction are affirmed.

---

16. Appellants have obliquely suggested that "scheme" in § 17(a) (1) is identical with "conspiracy" in Count 1 of the indictment, on which the jury could not reach a verdict. Passing the fact that the jury's verdicts need not be consistent, Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), we find ample reply to appellants in the charge itself:

> "I caution you that I am using the word scheme here, by the way, in a somewhat different sense that I have been or will be using it with relation to conspiracy law. Here in regard to these counts charging fraud, I specifically instruct you that in the meaning of

Section 17 of the Act a single individual or person can engage in a scheme to defraud; the participation of others with him, in other words, is not necessary to the existence of a fraudulent scheme of this kind."

17. With one exception, all sales of Allied shares involved in these convictions were "dealer" ("principal") transactions—appellants selling for their own account and taking their profit (other than the secret commissions), not in the form of a commission from their purchasing customers, but in the spread between the price appellants paid for the stock and the price for which they sold it to their customers.