UNITED STATES of America,
Appellee,

v.

Paul M. KAUFMAN, Steven Burns, Alan Florea, and Irving Garber, Appellants.

Nos. 564–567, Dockets 33979, 33980, 34004, 34348.

United States Court of Appeals,
Second Circuit.

Argued March 18, 1970.

Decided July 22, 1970.

Daniel J. Sullivan, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. New York, William B. Gray, Arthur A. Munisteri, Asst. U. S. Attys., on the brief), for appellee.

Jacob W. Friedman, New York City (Slotnick & Narral, Arnold E. Wallach, New York City, on the brief), for appellant Kaufman.

Geoffrey M. Kalmus, New York City (Kramer, Lowenstein, Nessen & Kamin, Maurice N. Nessen, Charlotte Fischman, New York City, on the brief), for appellant Burns.

Jerome J. Londin, New York City (Carro, Spanbock & Londin, New York City, on the brief), for appellant Florea.

Burton S. Cooper, New York City (Shatzkin & Cooper, Edwin L. Smith, New York City, on the brief), for appellant Garber.

Before MOORE and FEINBERG, Circuit Judges, and BONSAL,* District Judge.

BONSAL, District Judge:

Paul M. Kaufman, Steven Burns, Alan Florea and Irving Garber appeal from judgments of conviction entered against them on July 29, 1969 after a seven-week trial before Judge Tyler and a jury. The indictment (68 Cr. 485) was filed on June 3, 1968 and charged ten defendants in seventeen counts. Five defendants, including the four appellants, went to trial, and twelve counts went to the jury. Count 1, the conspiracy count, charged a conspiracy under 18 U.S.C. § 371 to violate the anti-fraud provisions of the Securities Act of 1933 (15 U.S.C. §§ 77q(a) and 77x). The eleven substantive counts charged violations of these sections in sending confirmations of stock transactions through the mails. The substantive counts are also described as overt acts in the conspiracy count as acts done pursuant to the alleged conspiracy. Defendant Seigenfeld was acquitted by the jury with respect to the conspiracy count, the only one in which he was charged.

The jury convicted all four appellants under the conspiracy count; Kaufman and Burns on counts 3, 5, 8 and 9, in which they alone were charged; and Kaufman on counts 10, 11, 12, 13, 15, 16 and 17, in which he alone was charged.[1] For the reasons hereinafter stated, we affirm the convictions of each of the appellants.

### Statement of Facts

Daniel Kroll, who died in August 1963, was the former president of Donbar Development Corporation (Donbar), which was engaged in the development, building and sale of interracial residential real estate on Long Island and in New Jersey. In January 1963, Kroll lost a proxy fight and was removed from the presidency of Donbar. He owned 82,000 unregistered shares of Donbar, a thinly traded stock selling in the over-the-counter market. A part of his holdings was tied up in a voting trust agreement.

In March 1963, with the assistance of appellant Kaufman's law firm, Kroll obtained a no-action letter from the S.E.C., and later in the month began selling some of his available Donbar stock. He encountered difficulties and, in early April, asked for assistance from Mark Binstein, the chief Government witness, who, at the time, maintained an office under the name of National Market Relations, Inc. and employed a Mrs. Eveline Gold on a part-time basis.

Kroll, Binstein and appellant Garber, the owner and operator of an unincorporated over-the-counter securities firm, called Nassau Securities Service, worked out a scheme to sell some 40,000 shares of Kroll's Donbar stock to the public. The scheme involved the paying of cash bribes to salesmen, selective buying to raise and support the market price of the stock, controlled selling so as not to depress the market, and the "squeezing" of short sellers. Appellant Garber was to cause enough Donbar shares to be bought to raise its price from 3–3½, to

---

* Of the Southern District of New York, sitting by designation.

1. Defendants were sentenced on July 29, 1969. Kaufman received concurrent nine-month sentences and a $2,000 fine on each count, but execution of the prison term was suspended on all except the first count. Burns received concurrent four-month sentences and a fine of $1,000 on each of the Counts 1, 3, 5, 8 and 9, but execution of the prison term was suspended on all but the first count. Florea received a sentence of four months imprisonment on Count 1, the execution of which was suspended, and a fine of $1,500. Garber received a sentence of three months imprisonment and a fine of $1,000 on Count 1.

4¼–4¾. Appellant Kaufman joined the scheme and brought in S. C. Burns & Co., Inc. and its president, the appellant Steven Burns, to participate in the distribution of the Kroll stock. Cash payments were made to Burns in return for retail sales by his firm, and the payments were escrowed with Kaufman until the Burns sales had been completed. Kaufman introduced the principals of Harris, Clare & Co., clients of his law firm, to Kroll, and told them they would receive $1.00 cash per share for Kroll stock they sold to customers. Appellant Florea agreed to find brokers to take Donbar stock, and was to receive from Binstein 25¢ in cash for each share so taken. One of these brokers was Seigenfeld, who was acquitted of conspiracy by the jury. Florea was paid in cash by Binstein for his services.

The scheme was carried out during May and June, 1963. The selling of Kroll's available Donbar stock was substantially completed in June, 1963. His shares were sold at prices ranging from $3.00 to $4.00 per share, and thereafter the price dropped to $1.50 to $2.00 per share. None of the retail purchasers who bought Donbar stock were told of the cash payoffs which were made to salesmen to stimulate their recommendations or that the price of the stock was being rigged while they were buying.

### Sufficiency of the Evidence

The jury having found each of the appellants guilty, the evidence must be viewed most favorably to the Government. Glasser v. United States, 315 U. S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Bowles, 428 F.2d 592 (2d Cir., June 16, 1970); United States v. Tropiano, 418 F.2d 1069, 1075 (2d Cir.1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530; United States v. Kahaner, 317 F.2d 459, 467 (2d Cir.), cert. denied, Keogh v. United States, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963). So viewed, the evidence established an unlawful conspiracy to sell Kroll's Donbar stock through the use of fraudulent and manipulative devices, and the participation of each of the appellants in the conspiracy.

The Government was not required, as appellants contend, to prove that each appellant was involved in all phases of the conspiracy. It was sufficient for the Government to prove that each of them knowingly joined the conspiracy to sell the stock by the use of fraudulent and manipulative devices. United States v. Dardi, 330 F.2d 316, 327 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964) and cases cited therein. The evidence establishes that Garber aided Binstein and Kroll in setting up the scheme and undertook to supervise the distribution of the Donbar stock. Mrs. Gold and Binstein went to Garber's office to obtain information concerning the market operations. Kaufman, as Binstein and Kroll's attorney, actively participated in the conspiracy and acted as escrow agent for the cash payments to be made to appellant Burns and received cash from Binstein for that purpose. Burns does not deny that he was to receive payments from Kaufman, but he contends that he did not know of the market rigging aspect—"one prong of the prosecution's two-pronged scheme and conspiracy theory." As stated above, it is immaterial that he may not have known of all of the facets of the conspiracy.

Appellant Florea strenuously contends that he was not a member of the conspiracy, and we consider the evidence as to his participation in more detail.

Florea asserts that there is no evidence of his agreement to effect fraudulent sales of Donbar stock to the public, and that his participation was limited to the "buy" function. Binstein testified that following his first meeting with Kroll, he met with Florea and told him in detail what was contemplated—"that Mr. Kroll would pay $100 per 100 shares for anybody who wanted to participate in the corner, and in the run-up of the stock of Donbar Development Corporation." Binstein testified that,

"The brokers were told to buy the stock, to put in for clients or trading accounts or anything, but to be put away, not to be sold immediately thereafter, immediately after buying it,"

and that this was in substance what he told Florea.

Binstein testified that Florea visited his office on a number of occasions in May–June, 1963 in connection with the sale of Donbar stock. He testified that Florea "was coming to both collect money for himself and the people he had brought into the Donbar situation, and on a couple of occasions just to come to check [Binstein's daily progress report] * * * to see what buying was done by whom, to make sure he received what he thought he was entitled to." Binstein also testified that Florea had introduced him to Seigenfeld and Dietz Securities. Binstein testified that Florea demanded compensation for his services with respect to Harris Clare and Dietz Securities and that he made a number of cash payments to Florea in connection with Dietz and Harris Clare. Mrs. Gold testified concerning discussions between Florea and Binstein in Binstein's office that,

"He [Florea] was discussing the amount of money that Binstein owed him for putting certain buying into Donbar although I never actually saw him get paid,"

and that

"Mr. Florea was claiming compensation for Dietz buying."

Florea testified that he had never heard of Kroll and that he first heard of the Donbar company in 1967, in the U. S. Attorney's office. Florea conceded only that he knew Binstein, as they had been at West Point together. He testified that he never introduced any brokers to Binstein for the purposes of buying or selling Donbar, and he denied receiving any payments from Binstein in connection with Donbar stock. On cross-examination, Florea testified that he occasionally went to Binstein's office, where he saw Binstein and Mrs. Gold. Florea conceded that he could have heard about Donbar in 1963, that he may have told the U. S. Attorney in 1968 that Donbar was represented by Binstein in a public relations capacity, and that he may have heard Kroll's name mentioned 'in Binstein's office. He also testified that he knew Kaufman and may have seen Burns socially.

The evidence with respect to Florea presented a question of credibility for the finder of fact—whether to believe Binstein or to believe Florea. The jury deliberated two days and considered the evidence with great care, which is demonstrated by the fact that they acquitted Seigenfeld. The evidence establishing that Florea knowingly participated in the conspiracy, knowing both about the fraudulent sale of the Kroll stock to the public as well as the market support operation, was sufficient if the jury believed it—and they did.

■ Therefore, the evidence establishes that each of the appellants was a member of the conspiracy charged in the first count. Florea contends that the proof fails to show that he knew that the mails would be used in carrying out the conspiracy. However, the proof was sufficient to enable the jury to find that Florea knew that the mails would be used in connection with the distribution of Kroll's Donbar stock. Indeed, as a "registered representative," Florea must have known that the mailing of confirmations was routine in the sale of securities on the over-the-counter market.

■ Moreover, the proof showed that the confirmations which were the subjects of the overt acts in the conspiracy count and of the substantive counts, were in fact mailed, and that they were mailed in furtherance of the conspiracy. Therefore, the jury having found Kaufman and Burns guilty under the conspiracy count, could find them guilty under the substantive counts as well. The jury was not required to find that Kaufman or Burns knew or should have foreseen that the mails would be used in sending the confirmations listed in the

substantive counts. The mails are included in the statute as a ground for Federal jurisdiction. The recent decision of United States v. Blassingame, 427 F.2d 329 (2d Cir., June 1, 1970) overruling United States v. Houlihan, 332 F.2d 8 (2d Cir.), cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964) holds that the essence of the crime is the fraudulent scheme itself and that there is no reason why guilt under the statute should hinge upon knowledge that interstate communication or the mails were used. Since Kaufman and Burns were members of the conspiracy and the mailings were overt acts in furtherance of the conspiracy, they were properly found guilty of the substantive counts by reason of the fraudulent scheme in which they knowingly participated.

We find, therefore, that the evidence was sufficient to support the jury's conviction of the appellants on all counts.

### Government Exhibit 1

█ Government Exhibit 1, which was received in evidence over objection, was Binstein's daily progress record of the sales of Kroll's Donbar stock and the cash payoffs. The record started on May 16 and continued to June 6, 1963. It contains a number of corrections, side notes, and computations. Appellants Burns, Florea, and Garber urge that Government Exhibit 1 was not a business record and should not have been received in evidence. However, Exhibit 1 was a contemporaneous record kept in the ordinary course of business and was properly received. United States v. Re, 336 F.2d 306 (2d Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964). It was a record kept in furtherance of the conspiracy. The items were documented by other brokerage records and corroborated by testimony at the trial. It was clearly a business record kept for a business purpose. Therefore, Government Exhibit 1 was properly admitted, and it was for the jury to determine the weight to be given it.

### Government Exhibits 401–406—The Braun Schedules

█ A more difficult issue is presented by the Braun schedules. Braun was Kroll's accountant. He testified that he prepared these schedules on or immediately after June 11, 1963, following a meeting which he had with Kroll and Binstein, and that the schedules set forth information contained in Government Exhibit 1, which they furnished him, supplemented by information given to him by Kroll and Binstein at the June 11 meeting. There was evidence to indicate that the purpose of these schedules was to serve as an accounting between Kroll and Binstein, and perhaps to be used in a tax fraud in which they alone were engaged. The Braun schedules were not offered by the Government during the Government's direct case. Braun was called as a witness by appellant Florea, apparently in an attempt to contradict Binstein's testimony that Braun had laid out the format of Government Exhibit 1. In cross-examining Braun, the Government offered the Braun schedules to corroborate Binstein's testimony. The Government made effective use of the Braun schedules at the trial and in the course of its summation.

Appellants raised timely objections to the introduction of the Braun schedules —which objections were overruled. On this appeal, they contend that the Braun schedules should have been excluded under the hearsay rule and that the trial judge's failure to do so seriously prejudiced their rights to a fair trial. Appellants assert that the conspiracy had terminated before June 11 and that, therefore, the Braun schedules were not and could not have been prepared in furtherance of the conspiracy, and were therefore mere prejudicial hearsay as to them.

However, the evidence indicates that the conspiracy had not come to an end when the Braun schedules were prepared. The settlement dates on various sales of the stock did not occur until after June 11, and other activities in

connection with the distribution of the stock were not finally concluded until June 24, 1963. We note that much of the information contained in the Braun schedules had been previously set forth in Government Exhibit 1. Moreover, even if the Braun schedules were in the nature of an accounting between the primary conspirators, Binstein and Kroll, they also revealed the status of the conspiracy with respect to the appellants. As such, they were properly received as a business record made before the final termination of the conspiracy, setting forth the interests of those involved. United States v. Cohen, 384 F.2d 699, 701 (2d Cir.1967); United States v. Hickey, 360 F.2d 127, 143–144 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966); United States v. Re, *supra*. The appellants were given adequate opportunity to cross-examine Braun with respect to the schedules and to argue in their summations the weight to be given them by the jury.

### Other Contentions

The remaining contentions of the appellants do not require extended discussion.

■ Appellants Florea, Kaufman, and Garber contend that their cross-examinations of the Government witnesses were unduly restricted by the trial judge, but we find these contentions to be without merit. The trial judge in a lengthy trial must be afforded reasonable discretion to limit cross-examination, and we do not find that the trial judge abused this discretion, United States v. Crosby, 294 F.2d 928, 944 (2d Cir.1961), cert. denied, Mittleman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). Appellants complain that they were not allowed to cross-examine Binstein regarding his relationship with a professional basketball team or whether he had informed his associates in that venture that in return for testifying "he was not going to get a jail sentence." The record reveals that this issue came up out of the hearing of the jury when Seigenfeld's attorney engaged in a lengthy colloquy with the trial judge. At the end of it, the trial judge allowed Seigenfeld's attorney to ask the questions in another form, but he didn't follow it up and neither did the attorneys for the appellants. Nor was it error for the trial judge to preclude inquiry as to Binstein's address. United States v. Persico, 425 F.2d 1375 (2d Cir., April 15, 1970). In view of the prior relationship between Binstein and appellants, it is hard to see why this was prejudicial, nor did any of the appellants advance sufficient reason to show that it was prejudicial.

■ Kaufman and Florea contend that the trial judge erred in allowing testimony by Mrs. Gold concerning a prior illegal stock distribution in which Florea and Binstein, and perhaps Kaufman, were involved. However, except for statements made by Mrs. Gold outside of the hearing of the jury, her testimony does not contain any references to prior illegal acts in which the appellants were involved.

■ Appellant Garber, who appeared *pro se* throughout the trial, contends that he was improperly restrained by the trial judge and that these restraints violated his constitutional right not to testify. Garber's argument is totally without merit. The record shows that from time to time he made statements directly to the court and jury and was properly restrained by the trial judge. Indeed, to the extent that some of his statements might be construed as testimony he may have waived his right to refuse to testify. *See*, United States v. Lacob, 416 F.2d 756, 760 (7th Cir. 1969), cert. denied, 397 U.S. 1003, 90 S. Ct. 1114, 25 L.Ed.2d 415 (1970); Redfield v. United States, 315 F.2d 76, 80 (9th Cir.), cert. denied, 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550 (1963). During the course of Garber's rambling cross-examination of Binstein, the trial judge remarked, "Don't ask him that kind of thing. Ask him questions having to do with what he has testified to on direct examination by Government

counsel. You will have a chance later to tell your side of the story, if you care to." Garber has made no showing that the trial judge's remark was prejudicial error. *See,* United States ex rel. Miller v. Follette, 397 F.2d 363, 367 (2d Cir. 1968), cert. denied, 393 U.S. 1039, 89 S. Ct. 660, 21 L.Ed.2d 585 (1969). Throughout the trial, the trial judge sought to protect Garber's constitutional rights, and, indeed, he helped him on various occasions to frame proper questions.

■ Appellant Kaufman contends that the trial judge erred in striking the testimony of New York Supreme Court Justice Louis B. Heller, his principal character witness. However, Justice Heller was unable to testify as to Kaufman's reputation in the community. He testified only that he knew the appellant and his family, had seen him socially, and that the appellant made "a very good impression" on him. He did not testify as to the community in which Kaufman lived or the circles in which he moved, and hence could not speak with authority as to his reputation in the community. *See,* Michelson v. United States, 335 U.S. 469, 478, 69 S.Ct. 213, 93 L.Ed. 168 (1948); 3 Wigmore, Evidence, § 691 at 17 (3d ed. 1940).

■ Appellant Garber complains that his Fifth Amendment privilege against self incrimination was denied him when the District Court ordered the production of his noncorporate business records pursuant to a Grand Jury subpoena. He had discontinued his business prior to the issuance of the subpoena. As a registered broker-dealer, Garber was required by S.E.C. regulations to make and keep the records in question so that the same would be available for inspection and examination, and the protection of the Fifth Amendment does not apply. Shapiro v. United States, 335 U.S. 1, 32, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *see,* United States v. Pine Valley Poultry Distributors Corp., 187 F.Supp. 455, 457 (S.D.N.Y.1960).

■ Appellant Burns contends that he was prejudiced by the trial judge's refusal to allow him to go to trial with defendant Seigenfeld's former lawyer. Seigenfeld's lawyer moved to disqualify his predecessor from representing Burns at the trial or, in the alternative, for a severance of Seigenfeld. The lawyer opposed the motion and later sought a writ of mandamus directing Judge Tyler to permit him to continue as Burns' attorney—which was denied by the Court of Appeals (Burns v. Tyler, Docket No. 33376, March 21, 1969). The trial judge was well within his discretion in directing Burns to obtain another lawyer in view of the possible conflict of interest between Burns and Seigenfeld. *See,* Consolidated Theatres v. Warner Bros. Circuit Management Corp., 216 F.2d 920 (2d Cir.1954); T. C. Theater Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265 (S.D.N.Y.1953). Indeed, the wisdom of this exercise of discretion was demonstrated by the acquittal of Seigenfeld and the conviction of Burns.

■ Burns also contends that since he was acting as principal and not as broker in the sale of the Donbar stock, he had no duty to disclose to customers the cash payments which he was receiving. (*See,* United States v. Bilotti, 380 F.2d 649, 657 n. 17 (2d Cir.), cert. denied, 389 U.S. 944, 88 S.Ct. 308, 19 L. Ed.2d 300 (1967); United States v. Hayutin, 398 F.2d 944, 949 (2d Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 400, 21 L. Ed.2d 374 (1968).) However, the receipt of these cash payments and the failure to disclose their receipt to customers was circumstantial evidence to be considered by the jury in determining whether or not Burns was a member of the conspiracy to sell the Donbar stock through the use of manipulative and unlawful devices.

■ Garber claims that his participation in the conspiracy terminated on June 3, 1963, on the ground that after that date he no longer bought Donbar stock but, on the contrary, was selling it

—which he says is "evidence that the conspiracy had failed. *See*, Fishwick [Fiswick] v. United States, 329 U.S. 211, [67 S.Ct. 224] 91 L.Ed. 196, 200." He therefore contends that the statute of limitations had run as to him. However, there is no evidence from which the jury could have concluded that Garber affirmatively withdrew from the conspiracy on or before June 3, and he therefore remained tied into the conspiracy with respect to overt acts committed by other members of the conspiracy after that date.[2] Moreover, the evidence showed that Garber's activities in supervising the distribution of the Donbar stock continued after June 3.

The remaining allegations of error require no comment, and the conviction of the appellants is affirmed.

2. The trial judge had originally charged the jury that they must find at least one overt act was committed prior to June 3. After this was brought to his attention, he corrected his charge and instructed the jury that "at least one of the overt acts [was] allegedly committed on or after June 3, 1963." The trial judge told the jury that June 3, 1963 was the cutoff date for the statute of limitations and that it was for this reason that the jury must find that at least one of the overt acts took place on or after that date.