**UNITED STATES of America,
Appellee,**

**v.**

**Gilberto SANTANA, Defendant-
Appellant.**

**No. 89, Docket 73-1702.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 11, 1973.

Decided Oct. 1, 1973.

Bobby C. Lawyer, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty. S. D. N. Y., and John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellee.

Gerald L. Shargel, New York City, for defendant-appellant.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Gilberto Santana appeals from a judgment of the District Court for the Southern District of New York convicting him, after a verdict, of possession of approximately 34 grams of cocaine with intent to distribute and of simple possession of the same, in violation of 21 U.S. C. §§ 812, 841(a)(1), 841(b)(1)(A), and 844.

I.

The most serious point raised on appeal is the correctness of the court's ruling, at the conclusion of a pre-trial suppression hearing, which upheld the legality of the seizure of the cocaine. The circumstances, briefly stated, were as follows:

On the night of June 8, 1973, Patrolman John DeRosa, a narcotics investigator assigned to the New York Joint Task Force, had under surveillance the La Concha restaurant on Manhattan's Upper West Side. The restaurant was known to the police to be a meeting place for persons engaged in narcotics activities. Accompanying DeRosa in a government car was Detective Patrick Campbell of the New York City Police Department.

Late in the evening, the officers saw Santana and a companion, who later

turned out to be Alfredo Aviles,[1] drive up to the restaurant and illegally double park in front. Santana and Aviles entered the restaurant and returned to the car half an hour later, with Santana carrying a brown paper bag.[2] DeRosa testified that he recognized Santana as being among the 100 major narcotics violators in New York City, according to police files, and that an anonymous informant had told him Santana was "heavily engaged in narcotic activities." Santana and his companion then drove to a nearby apartment building at 331 West End Avenue, with the police following in their vehicle. After again double-parking the car, Santana entered the building and emerged about ten minutes later carrying a second brown paper bag.[3]

Meanwhile the officers left their vehicle and continued the surveillance on foot. Santana reentered his car on the driver's side and prepared to drive off. DeRosa then walked up to the car and tapped at the window on Santana's side. When Santana lowered the window, DeRosa asked him to produce his driver's license and registration. Santana voluntarily opened the door, stepped out of the car, and reached for his wallet, leaving the door about two feet open. DeRosa then pushed the door the rest of the way open—about another foot—and stepped between the door and the car. He testified that from that position he could see a clear plastic bag filled with a white powdery substance that had been secreted between the door and the front seat. DeRosa seized the bag, which he correctly assumed to contain narcotics, and the officers immediately arrested Santana and Aviles for drug violations.

Santana contends that, both because of DeRosa's admitted pushing of the door and because, as he alleges, the evidence shows that DeRosa stuck his head inside the car before observing the clear plastic bag, the seizure violated the Fourth Amendment. The Government concedes that the officers did not have probable cause to search the car but argues that the seizure should be upheld under the "plain view" doctrine.

Although Santana has not questioned the legality of the officer's request for the production of identification, this point should be considered since it bears on the permissible limits of the subsequent conduct. While the Government relies in part on the double-parking violation, we are by no means convinced that the stop and subsequent seizure could be justified on that ground alone. To be sure, a number of cases have sustained seizures where the police have stopped traffic violators and have subsequently seen narcotics or other evidence of crime in the stopped car. *See, e. g.,* Busby v. United States, 296 F.2d 328 (9 Cir. 1961); Jefferson v. United States, 121 U.S.App.D.C. 279, 349 F.2d 714 (1965); United States v. Bourassa, 411 F.2d 69 (10 Cir.), cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Stotts v. Perini, 427 F.2d 1296 (6 Cir. 1970); United States v. Drew, 451 F.2d 230 (5 Cir. 1971); United States v. Mahanna, 461 F.2d 1110 (8 Cir. 1972). But in those cases the traffic violation was the reason for the stop. Here the officers were interested in narcotics violations, not in traffic offenses, as is evidenced by their failure to question Santana at all when he double-parked in front of the restaurant or when he first double-parked at 331 West End Avenue. The demand for identification was made not when he engaged in the double-parking but when he was about to cease it. In their testimony the officers made no pretense that their demand for identification was based on the double-parking.[4] Amador-Gonzalez

---

1. Aviles was indicted along with Santana but his trial was severed.

2. The bag was later found to contain *paella.*

3. The second bag was later found to contain a can of frozen orange juice.

4. On cross-examination, Officer DeRosa testified that he stopped Santana to check his license and registration and to identify Aviles, who was unknown to the officers.

v. United States, 391 F.2d 308 (5 Cir. 1968), held that a pretextual arrest for a traffic violation would not support an incidental search of a car. See also Taglavore v. United States, 291 F.2d 262, 265 (9 Cir. 1961); State of Montana v. Tomich, 332 F.2d 987, 989 (9 Cir. 1964); United States v. Harris, 321 F.2d 739, 741 (6 Cir. 1963); Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449, 452 (1968). It may well be that the same view should prevail with respect to a "plain view" of the inside of a car resulting from a pretextual stop for such a minor offense.

■ However, we need not decide that point since the "stop" and the request for identification in this case were justified under the principles of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L. Ed.2d 612 (1972). The officers were surveilling a restaurant known to be a headquarters for the narcotics trade. They saw a prominent figure in the trade emerge with the brown paper bag which has long been a sort of hallmark of the narcotics business,[5] cf. United States v. Montalvo, 271 F.2d 922, 924–925 (2 Cir. 1959), although, of course, such bags are used to carry many other things as proved to be the case here. The stop at the apartment building at 331 West End Avenue and Santana's emergence with another brown paper bag heightened the officers' suspicion that Santana and Aviles were preparing to make a sale. The officers had left their car and it might well have been impossible for them to resume the surveillance in time to catch up with Santana and Aviles and see what they were about. The combination of these circumstances sufficed to meet the rather lenient test for a stop which the Supreme Court, reversing this court, ap-

plied in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

It is not clear from the Court's stop and frisk decisions how far a permissible stop of a car authorizes a quick glance at its interior for reasons unrelated to the officer's safety. None of the cases in the *Terry* trilogy involved a car; so far as concerns a person not in a car, Sibron v. New York, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), held that a stop merely authorizes police to take reasonable precautions for their own safety while interrogating the person who has been stopped. Adams v. Williams did involve a car, but the search was justified as incident to an arrest for which the policeman's observations, in the interest of self-protection, had afforded probable cause, 407 U.S. at 148–149, 92 S.Ct. 1921.

■ However, on the facts here DeRosa's observation of the interior of the car was justified even on a strict reading of the Court's decisions. While DeRosa had received no specific information that Santana or Aviles was armed, it would not be unreasonable for a policeman to assume that a man believed to be one of the top narcotic violators in the New York area would be carrying arms or would be otherwise violent.[6] DeRosa's only intrusions consisted of pushing the door open a foot further than Santana had left it and then stepping inside the door to get on the same side as Santana. The Government contends these were proper precautions to prevent Santana's shoving the open door against the officer and cites DeRosa's testimony "That's the training we received in the New York City Police Department." While the officer's remark does not make it entirely plain whether the objective of the "training" was to enhance safety, as could well be true, or

---

5. At the suppression hearing, DeRosa testified that he had participated in "at least two dozen" narcotics investigations or arrests in which drugs were concealed in brown paper bags.

6. In fact, after the arrest the officers discovered that Aviles was carrying a gun. He was subsequently indicted for carrying a firearm during the commission of a federal felony, in violation of 18 U.S.C. § 924(c)(2).

to provide an opportunity for looking into stopped cars, we must take the inference more favorable to the Government.[7] Having gone that far, we see no basis for discrediting DeRosa's testimony that once he assumed his position inside the door he immediately saw the plastic bag and then leaned into the car to pick it up. Officer Campbell's testimony was not truly in conflict, as appellant urges it to be. Campbell testified that DeRosa bent into the car and then told Santana he was under arrest. Since Campbell would have no way of knowing precisely when DeRosa spotted the narcotics, his testimony is not inconsistent with DeRosa's claim that he saw the bag before leaning into the car. Beyond this, we see no reason why Officer DeRosa would not be entitled to make a cursory inspection of the car to see whether it contained a weapon readily available to Aviles, who remained seated on the passenger side. See Bell v. United States, 102 U.S.App.D.C. 383, 254 F. 2d 82, 83–84 (1958); United States v. Kim, 430 F.2d 58, 61 (9 Cir. 1970); cf. United States v. Booker, 461 F.2d 990, 992, 993 (6 Cir. 1972).

A more satisfying basis for upholding the seizure would be furnished by analysis similar to that employed in Dorsey v. United States, 125 U.S.App.D.C. 355, 372 F.2d 928 (1967). That case likewise involved known narcotics violators seated at night in a parked car. There had not been the suspicious comings and goings that existed here, but an officer, upon approaching the car, saw two of them looking at something on the seat. Directing his flashlight into the car, he saw Dorsey holding a cellophane bag filled with white-powdered gelatine capsules. Another agent who was summoned reached through the open car window, seized the bag and placed Dorsey under arrest. The court sustained

the seizure on the ground, 372 F.2d at 930–931, Judge McGowan said, that:

> When the officers suddenly saw them situated as they were at the time and place in question, the former were entitled to extend their preventative patrolling mission to the extent of approaching the car and observing what was going on inside. . . . If policemen are to serve any purpose of detecting and preventing crime by being out on the streets at all, they must be able to take a closer look at challenging situations as they encounter them.

We read this to mean that officers are entitled to seize articles that are permissible subjects of search and seizure, see ALI, Model Code of Pre-Arraignment Procedure Section SS 210.3, if these articles come into plain view while the officers are pursuing their lawful duties and can be seized without a search. The instant case fits the *Dorsey* analysis comfortably, because here the officer gained his view of the narcotics as the direct result of a lawful stop.

While we would adopt the principle of *Dorsey* if free to do so, that course presents difficulties we prefer to avoid. The decision antedated the *Terry* trilogy and, as indicated above, the dimensions of the authority recognized in *Terry* are uncertain. More important, upholding the seizure on the basis stated in *Dorsey* would require consideration of the meaning and the viability of the much-discussed "inadvertence" qualification of the plain view doctrine in Mr. Justice Stewart's plurality opinion in Coolidge v. New Hampshire, 403 U.S. 443, 469–473, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), see Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 237–50 (1971)—subjects which will almost certainly receive further attention from the Court.[8] We therefore think it best to

---

7. Our review of this case has been made more difficult by the trial judge's failure to make findings of fact in support of his conclusion that the evidence should not be suppressed.

8. Four Justices dissented in *Coolidge*, and Mr. Justice Harlan's concurrence did not embrace Mr. Justice Stewart's "inadvertence" theory. In view of the plethora of opinions, it is hard to see how (save for the

**370**

sustain the seizure on a basis consistent with Mr. Justice Stewart's opinion, namely, that Officer DeRosa "inadvertently" saw the plastic bag while taking steps to ensure his safety in the course of a valid stop for interrogation with regard to a suspected narcotics offense.

## II.

■ Santana claims that, in three respects, the prosecutor's summation deprived him of a fair trial. We disagree.

Defense counsel argued at length in his summation that Aviles had "framed" Santana. He did not suggest that the United States Attorney's office was involved in the frame-up, but during cross-examination of DeRosa he called attention to the fact that Aviles was not on trial with Santana, implying that Aviles, who did not testify, received preferential treatment for his cooperation in "getting" Santana. And in his summation, while discussing the alleged "frame-up", Santana's counsel said: "Aviles framed him. Aviles is named in this indictment but Santana is on trial." The obvious implication of that statement was, once again, that Aviles had received preferential treatment—and perhaps even amnesty—from the prosecutor for his part in trapping Santana. The Assistant United States Attorney answered this charge by saying:

> He [Aviles] was indicted. So, if all that is a big setup, it means the United States Attorney's office is also participating in it. We are going around indicting people who we know didn't have anything to do with it, to put up a front for you, which, of course, would be unethical and illegal. We don't know about that.

While unduly rhetorical, this comment was not so unfair an answer as to call for reversal, particularly in the absence of objection. See United States v. La-Sorsa, 480 F.2d 522, 525 (2 Cir. 1973).

■ The second claim is that the prosecutor revealed Santana's unsuccess-

ful attempt to secure suppression. The short answer is that he did not. Defense counsel had repeatedly suggested to the jury that the police officers had unlawfully arrested Santana and had seized the cocaine pursuant to an unlawful intrusion into his car. To this the prosecutor responded:

> It was claimed that the police officers unlawfully seized this stuff, perhaps they even unlawfully searched the car. There is, of course, a difference between searching something and seizing it.

> Put yourself in the position of a policeman, the middle of the night, out on the street, he is working narcotics cases. He makes an approach, ladies and gentlemen, on people who he thinks are engaged in narcotics traffic. What's the guy supposed to do? Let them go? Let them walk away with this garbage? What would you have done? I mean the police officers would have been damned if they didn't stop them, they are being damned because they did. What are you going to do?

We see nothing wrong in this.

■ A somewhat more serious point, and the only one to which objection was made, was the prosecution's allegedly improper characterization of the police officers. In answer to defense counsel's persistent suggestions that the police officers were lying about critical facts, the prosecutor said that Officer DeRosa "knows the underworld of narcotics. He knows what illegal trafficking in narcotics is." Referring to both officers, the prosecutor later added, "They arrest people all the time, they do dangerous undercover work, they are in and out of courts a lot. Couldn't they come up with a better lie if they were lying? They were telling the truth, ladies and gentlemen. You heard it, just what happened." While the Government concedes that it would have been better if the reference to "the underworld of nar-

point discussed in Part III of Mr. Justice Stewart's opinion) this frequently cited case

stands for anything except that Coolidge's conviction was reversed.

cotics" had not been made, these remarks did not rise to the level of prejudice required for reversal, especially in a case like this where the physical evidence we have summarized was bolstered by two volunteered admissions and a written statement given after full *Miranda* warnings.

In this, as in many other cases where a defendant's guilt is plain, counsel for a defendant who insists on standing trial has little to offer except attack on law enforcement officers. While prosecutors would be wiser not to take such attacks too seriously, they can hardly be censured for responding sharply to criticisms they believe to be wholly unjustified, and courts should not be overly nice in such cases in scrutinizing the give-and-take of summation. Save in extreme instances, the judge's charge and the jury's good sense can be counted on to set things right. See United States v. DeAlesandro, 361 F.2d 694, 697 (2 Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966); United States v. Briggs, 457 F.2d 908, 911–912 (2 Cir.), cert. denied, 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972). We are confident that was the case here.

### III.

Santana's final point relates to the court's having given, without objection, what apparently was a "boilerplate" charge as follows:

If you find the presumption of truthfulness to be outweighed as to any witness, you can do one of two things —you can reject all of that witness' testimony on the ground that it was all tainted by falsehood and that none of it is worthy of belief or you can accept that part which you believe to be credible and reject only that part which you believe to be tainted by falsehood.

It would seem indeed that six years after United States v. Bilotti, 380 F.2d 649, 655–656 (2 Cir.), cert. denied, 389 U.S. 944, 88 S.Ct. 308, 19 L.Ed.2d 300 (1967), and eight years after the objectionable form had been changed, see Mathes and Devitt, Federal Jury Practice and Instructions No. 72.01 (1965), references to a "presumption" of truthfulness would have disappeared from charges in this circuit. Here, however, the judge did not repeat the most objectionable part of the charge condemned in *Bilotti*, namely, the affirmative statement, "In our law there is a presumption that unless and until determined by you to be outweighed by the evidence to the contrary, a witness speaks the truth." He simply made a backhanded reference to such a presumption and told the jury what it might do if it found this to be outweighed. Moreover, the judge had given another entirely correct instruction on how the jury should go about determining credibility. Under such circumstances the charge was surely not plain error; it is absurd to suppose the jury was misled simply by the judge's having said "presumption" rather than "assumption." See Knapp v. United States, 316 F.2d 794 (5 Cir. 1963). However, we again remind trial judges of Judge Anderson's admonition with respect to this instruction in United States v. Bilotti, *supra*, 380 F.2d at 656, that it "may in some cases be very misleading and the trial courts would best refrain from using it." In addition, we find it difficult to visualize a case where even the remodeled instruction serves any purpose not met by the general instruction on credibility determination. Indeed, it would be wise for judges to examine their charges generally with a view to removing barnacles which do not promote the jury's understanding but increase length and augment the possibility of claims of error.

Affirmed.