**UNITED STATES of America**
**v.**
**Herbert M. JOHNSON, Appellant.**
**No. 15780.**

United States Court of Appeals
Third Circuit.

Argued Oct. 3, 1966.

Decided Jan. 3, 1967.

---

3. See Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941).

Michael A. Querques, Orange, N. J., for appellant.

Maurice R. Strickland, Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S. Atty., Newark, N. J., on the brief), for appellee.

Before FORMAN, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge.

Defendant appeals from a conviction on two counts, one charging the unlawful sale and the other the unlawful possession of counterfeit currency.

Able counsel appointed to represent him urges a number of contentions on his behalf: (1) the defense of entrapment should have prevailed as a matter of law because the government failed to prove defendant's predisposition to commit the offense; (2) the trial judge erred in charging the jury that a presumption of truthfulness should be accorded the testimony of witnesses; (3) the charge erred in describing the possession necessary to constitute the crime; (4) the government's evidence showed that defendant was a procuring agent as a matter of law; and (5) the charge erred

in limiting the operation of any unfavorable inferences to be drawn from the failure to produce witnesses.

## I.

The record begins with an informer's introduction of a federal narcotics agent named Peterson to the defendant on July 13, 1962 at a music shop where the informer worked. Peterson was not affiliated with the Secret Service, which normally handles counterfeit cases, but was employed in the New York City office of the Federal Bureau of Narcotics. He came to Newark, New Jersey on special assignment at the direction of his district supervisor, on the morning of July 13th. There he met with Secret Service agents and the informer. Later in the day he went with the informer to the music shop where the defendant was awaiting them. On direct examination Peterson testified that the informer introduced him "as a person who wanted to buy counterfeit notes", although he later on cross-examination omitted this in referring to the introduction. According to Peterson, the informer thereupon went to the rear of the store and immediately afterward, without Peterson saying anything further, the defendant "asked me if I was interested in buying some papers of $20 denomination which was a very good quality. I told him I was, and I asked him if the paper would be the same as that I had previously seen before. He said it would be." There was some preliminary discussion regarding price and it then became clear that the defendant would have to obtain the counterfeit currency from someone else. The informer drove them to a bar to obtain $500 in counterfeit currency from the supplier. Defendant entered the bar alone and then returned to tell Peterson that the supplier, who was later identified as one Brianza, would not sell less than a full package of $1,000 in counterfeit currency. Although defendant agreed to meet with Peterson later that evening, he did not

appear, but five days later, under circumstances which Peterson could not explain, defendant returned to the music store and resumed negotiations with Peterson in the presence of the informer. An appointment was arranged for Peterson to purchase a full $1,000 package from defendant at a restaurant that evening. This time defendant appeared for the appointment, but after going alone to meet his supplier returned and told Peterson that the supplier had already sold the package, but that he could secure another later in the evening. Ultimately that evening defendant delivered 49 counterfeit $20 bills.[1] Both at the original meeting and at the meeting at which the counterfeit currency was passed, defendant had requested from Peterson an additional $10 "for his troubles".

It is evident, of course, that prior to the July 13th meeting there must have been discussion in the Federal Building at Newark between Peterson and his new supervisors and other agents who had worked on the case, as well as with the informer. The government, however, presented only two witnesses in addition to Peterson. One, Agent Marass, testified concerning the counterfeit nature of the bills, and said that he knew nothing of what Peterson had said to the informer, although he had instructed Peterson on the part he was to play. He also revealed that the informer had been in custody for counterfeiting activities and had agreed to "cooperate" with the government in undercover work. The other government witness, Agent Powis, testified to the surveillance of the defendant on the evening the currency was passed, in confirmation of Peterson's testimony. He acknowledged that a second agent was in charge of the case and that certain other agents had taken part in it. These agents, whose identities were revealed in the testimony, were available to defendant, but the informer was unavailable at the time of trial.

1. An effort was made by the government to show that the missing bill was the item defendant had been observed tearing to pieces, but it turned out that what was torn up was a white piece of paper and it is now conceded that it could not have been the missing bill.

In an often quoted passage in United States v. Sherman, 200 F.2d 880, 882–883 (2 Cir. 1952), Judge Learned Hand isolated the two elements in entrapment, which for brevity have been labeled "inducement" and "predisposition": "(1) [D]id the agent induce the accused to commit the offence charged in the indictment". This need not be trickery or fraud, but "includes soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged". "(2) [I]f so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it."[2]

■ Because the government must prove a defendant's guilt beyond a reasonable doubt, this formulation which imposes upon a defendant a burden of proof as to "inducement," has tended to create confusion regarding the nature of the burden of proof and even as to the nature of the defense of entrapment itself. See Notaro v. United States, 363 F.2d 169, 174 (9 Cir. 1966); Sagansky v. United States, 358 F.2d 195, 202–203 (1 Cir. 1966). In the present case the element of "inducement" was shown in the government's testimony and the trial judge therefore in effect treated it as established as a matter of law and did not submit this element to the jury for its determination. Neither the defendant nor the government makes any complaint at this. Defendant urges, however, that under the evidence the trial judge should have found that entrapment was established as a matter of law because there was no evidence to go to the jury on "predisposition."

■ The propriety of inquiring into the "predisposition" of the defendant is authoritatively answered for us by Sorrells v. United States, 287 U.S. 435, 451–452, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). Chief Justice Hughes, speaking for the majority, there said: " * * * [I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense." Sorrells has been subjected to severe and weighty criticism because of the obvious difficulties it imposes upon a defendant in allowing the government to offer evidence of his past conduct and current inclinations.[3] The Supreme Court, however, has consistently refused to overrule Sorrells and it remains our governing rule.[4] Indeed, the court very recently reiterated on the authority of Sorrells that "it is settled that when the defense of entrapment is raised, evidence of prior conduct tending to show the defendant's predisposition to commit the offense charged is admissible."[5]

■ We have held that conduct such as the defendant's immediate and spontaneous response to Agent Peterson is adequate evidence of predisposition.[6] It was

2. See also United States v. Riley, 363 F.2d 955, 957–958 (2 Cir.1966); United States v. Smalls, 363 F.2d 417, 419 (2 Cir.1966); Notaro v. United States, 363 F.2d 169, 174 (9 Cir.1966); United States v. Pugliese, 346 F.2d 861, 862 (2 Cir.1965).

3. Sorrells v. United States, 287 U.S. 435, 458–459, 53 S.Ct. 210, 77 L.Ed. 413 (1932), separate opinion of Roberts, J., joined in by Brandeis and Stone, JJ.; Sherman v. United States, 356 U.S. 369, 382–385, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), Frankfurter, J., joined by Douglas, Harlan and Brennan, JJ., concurring in the result; The Serpent Beguiled Me And I Did Eat, The Constitutional Status of the Entrapment Defense, 74 Yale L.J. 942 (1965).

4. See Sherman v. United States, 356 U.S. 369, 376–378, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). See also Lopez v. United States, 373 U.S. 427, 434, 83 S.Ct. 1381, 10 L. Ed.2d 462 (1963).

5. Osborn v. United States, 385 U.S. 323, 332, n. 11, 87 S.Ct. 429, 434, 17 L.Ed.2d 394 (1966).

6. See United States v. Wallace, 269 F.2d 394, 397 (3 Cir.1959); United States v. Klosterman, 248 F.2d 191, 195, 69 A.L.R. 2d 1390 (3 Cir.1957); United States v. Sawyer, 210 F.2d 169, 170 (3 Cir.1954).

evidence here of the defendant's eagerness to engage in the criminal activity as soon as the occasion when he could do so was made known to him. The jury, therefore, could well have found that Agent Peterson opened the door to the defendant and that defendant's subsequent conduct did not spring from any influence of the government but was the product of his own desire. In the very recent case of Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), the defendant admitted that he had sold marihuana to an undercover agent who had telephoned him and said that he had been told by a mutual friend that the defendant might be able to supply the narcotic. To this the defendant responded that he could "take care of" the agent, and directed him to come to his home to consummate the sale. In the course of its decision that the use of a government undercover agent did not violate the Fourth Amendment, the Supreme Court indicated that there was no basis for a claim of entrapment.

■ We conclude, therefore, that there was sufficient evidence of predisposition to warrant submission of the issue to the jury and that there was no ground upon which the trial judge could have declared the defense of entrapment established as a matter of law.

■ What is striking, however, is the absence from the record of any explanation of how the meeting of July 13th was arranged and what may have passed between the informer and the defendant before the meeting. In this area, in which there is such a lack of testimony, one cannot avoid some wonder whether there was conduct which would have shed clearer light on both inducement and predisposition. As the case now stands, however, there is on the record no evidence of prior communication between the defendant and the government either directly or through the informer. Moreover, the defendant chose not to call the other government agents, although their identities were disclosed to him and they were available as witnesses. He could also have sought the aid of the court in locating the informer.[7] Indeed, he could have gone into this with Agent Marass, who had already testified regarding the plan worked out by the Secret Service with the informer. In any event, since a new trial is necessary on other grounds, the defendant will have a full opportunity to call the agents and the informer at the retrial.

## II.

■ The government's case was based entirely on the oral testimony of its witnesses. Their credibility was peculiarly a question for the jury and went not only to the issues involved in the defense of entrapment but also to the substantive charges contained in the two counts of the indictment. It therefore was of the highest importance that the presumption of the innocence of the defendant—who did not take the stand in his defense—should be preserved. Instead, in the course of his charge to the jury on the credibility of witnesses the trial judge, evidently employing a standard form,[8] said: "If you find the presumption of truthfulness to be outweighed as to any witness, you will give the testimony of that witness such credence, if any, as you think it deserves." Defendant's counsel made specific objection on the ground that this raised by implication a presumption of truthfulness and thus diluted the presumption of defendant's innocence. The trial judge rejected the objection. Judge Ganey has recently demonstrated on behalf of the court in United States v. Meisch, 370

---

7. Compare United States v. Clarke, 220 F. Supp. 905 (E.D.Pa.1963), where, however, the agent specifically testified to earlier preliminary meetings between the informer and the defendant.

8. Taken from Mathes, Jury Instructions and Forms for Federal Criminal Cases, 27

F.R.D. 67–68 (1961). As Judge Ganey showed in United States v. Meisch, 370 F. 2d 768, 773 (3 Cir. 1966), this has now been altered: Mathes and DeVitt, Federal Jury Practice and Instructions (1965) § 72.01.

F.2d 768 (3 Cir. 1966) that such an instruction is erroneous. The harm it did in this case is especially pronounced, since the defendant presented no evidence and the jury had before it only the testimony of the government's witnesses. The presumption of the truthfulness of the witnesses which the charge recognized therefore operated exclusively in favor of the government and amounted in effect to a presumption of the defendant's guilt and a direction that the government's evidence should be accepted and a verdict should be rendered against the defendant.

The error therefore was substantial, and since it was maintained over the defendant's specific objection, the judgment of conviction must be reversed and a new trial awarded.

### III.

Count I of the indictment charges that the defendant "did wilfully, unlawfully and with the intent to defraud, have in his possession at the Malibu Bar" the 49 counterfeit notes, knowing them to have been counterfeited, in violation of 18 U.S.C. § 472. The trial judge instructed the jury that the statute required only that defendant should have had possession of the notes, and that it was not necessary that he should have kept them for any particular period of time. Defendant specifically objected to the direction that it was not necessary to find that the defendant kept the bills in his possession for any particular length of time.

The indictment did not follow the exact language of the statute, which describes the offense as existing where one "*keeps* in possession" counterfeit notes. The charge of the court, however, described the offense in both forms. The variations between "have" and "keep" are, of course, of no moment if there is no significant difference in their meaning.

The present law is derived from the Act of June 30, 1864 (chap. 172, § 10, 13 Stat. 221), which laid down the requirement in the words "shall have or keep in possession". In the Revised Statutes of 1873, § 5431, the language was altered to "keeps in possession", and in the Criminal Code of 1909 (35 Stat. 1116, § 151) the language is "shall keep in possession". Thus, aside from difference in tense, "keep" was the determinative of possession from the Revised Statutes of 1873 to the present day, but the crime originally was described in words of "have or keep" in possession.

We need not enter upon a consideration of any theoretical difference in meaning between "have" and "keep" in possession. For whatever may be the shadings of difference between the two words, the history of the adoption of the Revised Statutes establishes that when Congress then prescribed the offense to exist when one "keeps in possession" counterfeit obligations of the United States it did not intend to make any change in the previously existing law which had used the words "shall have or keep in possession". In such circumstances "have" is interchangeable with "keep".[9]

By the Act of June 27, 1866 (14 Stat. 74, chap. 140) the President was authorized to appoint three Commissioners "to revise, simplify, arrange, and consolidate all statutes of the United States, general and permanent in their nature", in force at the time of their Report. The Commissioners' Report in early 1873 was found unacceptable because it had made many changes in existing law.[10] In consequence the Joint Committee of Congress authorized by the Act of March 3, 1873 (17 Stat. 579, chap. 241) to accept the Commissioners' Report employed an

---

9. Cf. Stewart v. Commonwealth, 208 Ky. 174, 270 S.W. 718 (1925); State v. Harwi, 117 Kan. 74, 230 P. 331 (1924).

10. See Dwan and Feidler, The Federal Statutes—Their History and Use, 22 Minn.L.Rev. 1008, 1013 (1938); Burdick, The Revision of the Federal Statutes, 11 Am.Bar. Assoc.J. 178, 179 (1925); 65 Cong.Rec. 639 (1924), remarks of Mr. Little.

attorney named Thomas J. Durant to go over their work and prepare it for congressional adoption. Durant's Report of December 10, 1873 to the Joint Committee shows that his main function was to eliminate the substantive changes which the Commissioners had made in the course of compiling their revision. His report states: "Every section reported by the commissioners has been compared with the text of the corresponding act or portion of the act of Congress referred to, and wherever it has been found that a section contained any departure from the meaning of Congress as expressed in the Statutes at Large, such change has been made as was necessary to restore the original signification." [11] The Commissioners' Report as revised by Durant ultimately was adopted as the Revised Statutes of 1873.[12] The rejection by Congress of the Commissioners' original Report, the circumstances of its employment of Durant, and Durant's Report, make it clear that when Congress adopted § 5431 of the Revised Statutes which denounced it as a crime if one "*keeps* in possession" counterfeit notes, it intended no change in meaning from the earlier Act of 1864, § 10, which used the words "shall have or keep in possession" counterfeit notes. Since there is no difference in meaning despite the variation in language between the statute (18 U.S.C. § 472) and Count I of the indictment, there is no error in the trial judge's use of "have" in his description of the crime or in his instruction that no particular period of time was essential to complete the offense of possession of counterfeit notes.

The defendant's possession of the counterfeit notes, while of extremely short duration, was sufficient to bring his conduct within the terms of the statute, for he "had" and "kept" in his possession the counterfeit notes from the time he received them until he turned them over shortly thereafter to Agent Peterson. The fact that Agent Peterson accosted him earlier than he might have expected by coming to the parking lot in the rear of the building instead of waiting for the defendant to meet him at the entrance, which would have extended the time of possession, indicates that the distinction in time is without a difference. Defendant "kept" the notes in his possession from the time he obtained them until he turned them over to Agent Peterson and thus fell within the prohibition of the statute.

## IV.

Defendant argues that a directed verdict should have been entered in his favor on Count II because the evidence showed that he had acted merely as an agent of the buyer and therefore was not guilty of the sale proscribed by the statute. The trial judge instructed the jury that it should find the defendant not guilty of selling counterfeit money if it believed that Agent Peterson or the informer who was acting with him asked the defendant to get the counterfeit money for Agent Peterson, and that what the defendant did thereafter was on the prospective purchaser's behalf rather than his own, and that his purchase of the counterfeit money was from a third person with whom the defendant was not associated in selling counterfeit money, and that defendant delivered the money to Peterson without doing anything more. This gave the defendant as much as he was entitled to under the evidence, for the jury was free to believe from the circumstances which we have already set out that if the defendant was acting as an agent it was on behalf of Brianza and not of Peterson. Indeed, the jury had the right to conclude from defendant's conduct that he acted independently of Peterson and that he was acting on his own behalf, if not for Brianza. Peterson testified that defendant negotiated with him, spoke of the quality of the wares

11. Dwan and Feidler, supra, at 1014, n. 31, stated that the Superintendent of Documents had reported that Durant's Report could not be found. It is now to be found, however, in the Library of Congress.

12. Dwan and Feidler, supra, at 1014.

he would sell to him and fixed the price after some negotiation. Peterson also testified that defendant refused his request to meet with defendant's supplier. All this was not the action of Peterson's own agent. There was, therefore, adequate evidence to require the jury to determine whether the defendant was acting as a procuring agent for Peterson.

The cases upon which defendant relies are readily distinguishable. In United States v. Sawyer, 210 F.2d 169 (3 Cir. 1954), the defendant rejected the government agent's request that he secure heroin for him, but was moved a few moments later by the agent's feigned violent seizure and his plea for the drug to relieve him of his distress. The defendant yielded and immediately obtained the drug for the agent with the money which he gave him. The money was used entirely for the purchase of the heroin and the defendant obtained no compensation or profit from the transaction. But what is more important, we there held that in those circumstances the defendant was entitled to have submitted to the jury the question whether he had undertaken to act on the prospective purchaser's behalf rather than on his own and in so doing had purchased the drug from a third person with whom he was not associated in selling and thereafter delivered it to the buyer. See 210 F.2d at 170. In the present case the trial judge submitted the question to the jury in a charge which followed the *Sawyer* case. In Adams v. United States, 220 F.2d 297 (5 Cir. 1955) the evidence was that the defendant had acted as a friend out of pity for the government's informer who had pretended to be suffering from withdrawal symptoms. There was no evidence from which a sale from defendant to the informer could be found beyond a reasonable doubt nor was there any evidence that she had profited in any way or was associated with the source from which she had obtained the narcotics. It was in these circumstances that the court after approving the principle laid down in United States v. Sawyer, supra, held that there was no materially conflicting evidence and that all of it was consistent with defendant's acting only as a purchaser or messenger instead of as a seller.

## V.

Defendant complains that the trial judge erred in limiting any unfavorable inferences which might be drawn against the government for its failure to produce witnesses to circumstances where the jury found from the evidence that such witnesses had knowledge of facts which were relevant to elements of the offenses charged.

 The rule which permits the fact finder to draw an inference unfavorable to a party who fails to call a witness is founded on the premise that the witness would have information which is relevant to the issues being tried. See United States v. Restaino, 369 F.2d 544, 547 (3 Cir. 1966); United States v. Meisch, 370 F.2d 768, 775 (3 Cir. 1966). In the present case the evidence indicated that there were other government agents, as well as the informer, who had participated in the planning of the government's activities. The trial judge therefore properly left it to the jury to determine from this if the witnesses had knowledge of facts relevant to the offenses charged and in that event to infer that their testimony would have been unfavorable to the government. If anything, the trial judge afforded the defendant a wider right to an inference than he was entitled to receive, because he did not restrict it to testimony which would not be merely cumulative. United States v. Restaino, supra, 369 F.2d at 547, quoting McCormick, Evidence (1954), § 249, p. 534. See also United States v. Meisch, supra, 370 F.2d at 768.

The judgment will be reversed and a new trial awarded.