UNITED STATES of America,
Appellee,

v.

Raymond C. DEMETRE, Appellant.

No. 71-1738.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1972.

Decided Aug. 16, 1972.

Gerald R. Freeman, Minneapolis, Minn., for appellant.

Thorwald H. Anderson, Jr., Asst. U. S. Atty., Robert G. Renner, U. S. Atty., D. Minn., Minneapolis, Minn., for appellee.

Before ROSS and STEPHENSON, Circuit Judges, and URBOM,* Chief District Judge.

URBOM, Chief District Judge.

Raymond C. Demetre has been sentenced to five years imprisonment, after having been found guilty by a jury of five counts of counterfeiting and forgery under 18 U.S.C. § 474. The foundation of the government's case was the testimony of James E. Birch, an informant who worked hand in hand with Secret Service agents while negotiating an acquisition from Demetre of counterfeiting paraphernalia and the knowledge to operate the equipment.

Entrapment was the defense. Demetre by his own testimony fully admitted agreeing to show Birch how to photograph genuine money, how to make negatives and plates from the negatives, and how to print with a multilith machine in exchange for Birch's agreeing to give him $7,500.00, and that he, De-

* Of the District of Nebraska, sitting by designation.

metre, had developed the ability to bleach genuine one dollar bills and print on the bleached paper twenty dollar bills. Demetre asserted that Birch had approached him with a counterfeiting proposition and that Demetre had refused in several conversations until Birch appeared on March 1, 1971, with a bankbook showing a deposit of $7,500.00 in Birch's name. Only then did Demetre, according to Demetre, agree to the scheme and proceed toward carrying it to fruition.

The significance of the date of March 1 is that that is the date on which, by Birch's testimony, Birch received from the Secret Service the bankbook showing a balance of $7,500.00 in Birch's name. Demetre's theory at the trial was, therefore, that he had been the victim of governmental entrapment.

Birch's testimony in essence was that the specific counterfeiting scheme was Demetre's idea, beginning as early as February 22, 1971.

■ On appeal the three claimed errors center upon the receiving into evidence—by cross-examination of the defendant, Demetre, and during the government's rebuttal case through Birch on recall and two other witnesses—testimony that one John Fisher had been arrested about four months earlier for possessing and attempting to pass counterfeited twenty dollar bills. The propriety of such testimony becomes apparent upon an awareness that the heart of an entrapment defense is that the defendant was not predisposed to commit the crime until pressed to do so by the government. To counteract that defense the prosecution is entitled to place before the jury evidence tending to show predisposition.

The setting for the introduction of evidence about John Fisher was as follows: On direct examination during the government's case in chief, Birch testified that on or before February 24, 1971, Demetre had told him:

"That his [Demetre's] partner had got busted in a bar in Minneapolis trying to cash a bogus twenty dollar bill and the bartender recognized that it was a counterfeit bill and that there was, I think he said an off-duty policeman in there at the time and the man tried to run and they attacked him and got him down. In his wallet were two more twenty dollar bills."

By "busted" was meant "arrested." Birch further testified that Demetre told him at about the same time that

"When he [Demetre] and his partners were out passing some counterfeit money that he had bought a wallet for $14 and cashed a twenty dollar bill and bought a wallet for $14 and they had reprimanded him for paying that much for a wallet."

Birch testified also that Demetre on March 2, 1971, told Birch, during one of Birch's visits to Demetre's home, that Birch. had to leave because Demetre's partner was coming over at 2:30; that the partner, whom Birch could not identify, came before Birch could leave; that Demetre went upstairs to talk with his partner and on returning about ten minutes later to the basement, where Birch was, Demetre said he had been talking to his partner. All the foregoing was placed in evidence without objection during the prosecution's case in chief.

When Demetre testified in his own behalf, he insisted that the counterfeiting scheme was Birch's and that Demetre had agreed to join the scheme only after persistent efforts by Birch and only after Birch showed him the bankbook on March 1, 1971, showing a deposit of $7,500.00. The money was alluring to him, he said, because he was in a tight financial condition. On cross-examination he denied that he had had a partner, denied telling Birch that Demetre's partner was arrested for passing notes in a bar, denied that he said that his partner was coming to visit, denied that he went upstairs to talk to his partner, denied that he told Birch that he was going upstairs to meet someone about the counterfeiting deal, denied that he

had asked Birch to leave early, and denied that he told Birch that he, Demetre, was negotiating with anybody else about the purchase of the photographic equipment and negatives. Demetre admitted that he may have received a visit from someone on March 2 after Birch left. Over objection Demetre testified on cross-examination that it was possible that John Fisher came to see him shortly after Birch left Demetre's home on March 2, 1971, and identified two photographs, government exhibits 38 and 39, as being of John Fisher, an acquaintance, although earlier in his testimony Demetre had said that he could not identify the person or persons in the photographs.

On rebuttal the United States recalled Birch, who over objection recounted three conversations he had had with Demetre regarding Demetre's "partner": one relating to his partner's being arrested in Minneapolis, one to the effect that he, Demetre, was afraid that he had left some equipment in his partner's garage, and one to the effect that he, Demetre, had to "sell this deal" to his partner's brother but that Birch would not be excluded from making a separate deal.

Further rebuttal testimony was by Edwin Gunderson, a Minneapolis police officer. He stated that on October 30, 1970, he was present at the arrest of John Fisher, the person shown in government exhibit 39, at a bar in Minneapolis. Fisher, he said, was on the ground outside the bar, being detained there when Gunderson arrived at the vicinity of the bar. Gunderson testified that he obtained one twenty dollar bill from the bartender after the bartender claimed that a counterfeit bill had been passed, and obtained another twenty dollar bill bearing the same serial number from Fisher's billfold. Lyle Workman, an agent with the United States Secret Service, completed the rebuttal by testifying that the bills obtained by Gunderson from Fisher were made of genuine currency paper but that he could tell that they were counterfeit because of the printing characteristics on them, and by testifying that he learned that Fisher had a brother and a father in the printing business.

On appeal Demetre's position is that error arose from allowing cross-examination and rebuttal evidence of Fisher's doings, because it consisted of evidence of unrelated crimes by the defendant, evidence of association by the defendant of one who was then under indictment for another crime, evidence of the defendant's bad character, and evidence beyond the scope of the indictment. He relies principally upon a series of state court decisions from Minnesota and Washington, which are of little value in view of this court's decision in United States v. Brown, 453 F.2d 101 (8th Cir. 1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972). There it was said that "Once the issue of entrapment is raised similar activities may be shown," although the court recognized that when the inquiry is into past offenses it must be controlled in some reasonable manner.

Permitting by cross-examination or through rebuttal testimony the showing of the commission or possible commission of similar crimes within a reasonable period before the crime directly in issue represents an exception to the usual rule declared in Abernathy v. United States, 402 F.2d 582 (8th Cir. 1968), as follows:

"The general rule is that the introduction of a previous unrelated arrest by the prosecution demands reversal where the defendant has not placed his character in issue. . . . The exclusionary rule is required not because of lack of relevance but because such evidence is highly prejudicial, is calculated to weigh heavily with the jury and may cause it to prejudge the defendant on his past conduct."

The exception contained in United States v. Brown, supra, is entirely consonant with the statement in Sorrels v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932), that

". . . if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." Accord: Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848 (1958); United States v. Johnson, 371 F.2d 800 (3rd Cir. 1967); Holloway v. United States, 432 F.2d 775 (10th Cir. 1970).

The evidence here complained of was plainly relevant to the issue of entrapment, which had previously been raised by the defendant. It tended to show a predisposition to commit the very type of crime of which the defendant stood accused. A time span of about four months between Fisher's arrest and the commission of the crime for which the defendant was being tried was not excessive under the facts of the case, especially where the meeting between Fisher and Demetre was during the precise period covered by the indictment and evidence indicated that Demetre referred to him at that time as his partner with whom he was discussing counterfeiting activities.

Danger of prejudice is always present in use of evidence of previous crimes or associations with persons suspected of crimes, but the danger in this case is outweighed by the directness of the testimony to show predisposition of the defendant, as well as by the tendency of it to buttress the credibility of Birch, the prosecution's primary witness. Additionally, the trial court, before admitting the testimony, held a hearing outside the presence of the jury to ascertain that the government could connect Fisher's activities to the defendant, thereby averting the danger of placing merely a shroud of suspicion about the defendant because of someone else's acts.

Evidence of other similar crimes inevitably suggests bad character on the part of the defendant. But, as the evidence properly was received because of the entrapment defense, the side effects do not render it improper. United States v. Crawford, 438 F.2d 441 (8th Cir. 1971), does not dictate a different result. No entrapment defense was claimed there.

The argument that the evidence was outside the indictment is without merit. Had the evidence been offered before the defense of entrapment was put in issue, an exploration of the contention that it was outside the scope of the indictment would now be in order. But that is not the case.

No error occurred in the reception of the evidence.

Judgment affirmed.